# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Meleke Da'Shawn Stewart, Appellant.

Appellate Case No. 2018-001916

_____

Appeal From Horry County
Thomas W. Cooper, Jr., Circuit Court Judge

_____

Opinion No. 5873
Heard May 13, 2021 – Filed December 1, 2021

_____

**AFFIRMED**

_____

Tommy Arthur Thomas, of Irmo, for Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, Senior
Assistant Deputy Attorney General William M. Blitch,
Jr., Assistant Attorney General William Frederick
Schumacher, IV, and Assistant Attorney General
Caroline M. Scrantom, all of Columbia, all for
Respondent.

_____

**WILLIAMS, J.:** In this criminal appeal, Meleke Stewart asserts the trial court
erred in admitting (1) evidence retrieved from a warrantless search of his cell
phone data and (2) a recorded confession he made during custodial interrogation.
We affirm.

## FACTS/PROCEDURAL HISTORY

On June 16, 2014, at roughly 9:00 A.M., officers in the Myrtle Beach Police Department responded to a call regarding a suspicious car parked outside a hotel and found Alton Daniels (Victim) dead in his car. Officers obtained a search warrant for the vehicle and found two cell phones during their search. After obtaining a search warrant for the phones, the officers discovered Victim owned both. The search of one phone produced Victim's last communications, which occurred late the previous night with an unidentified phone number and discussed a meeting to exchange sex for money. Victim and the unidentified number negotiated the sexual encounter using text messages but began making short calls to each other around 12:40 A.M. A call log extracted from Victim's phone showed brief calls between Victim and the unidentified number at 12:40, 12:45, and 12:50 A.M. and a long call at 1:02 A.M. After the last call, Victim's phone did not send any texts or make any calls. At 1:17 A.M., Victim received an incoming call from another unidentified number, but the call was not answered.

Using a database, officers determined the first unidentified phone number belonged to a pre-paid phone and that Verizon was the service provider. Officers then contacted the pre-paid phone provider and requested the subscriber information related to the phone number. The phone provider named Stewart as the registered subscriber. Around 3:00 P.M. the same day, officers filed an emergency disclosure request[1] with Verizon, seeking subscriber details, cell site location information (CSLI), and call and text logs for Stewart's phone. Verizon informed officers that Stewart's phone had not connected to its network since 1:30 A.M. the morning of the murder and sent officers Stewart's subscriber information, incoming and outgoing call logs, text content, and real time tool (RTT) records.[2] Officers also

---

[1] An emergency disclosure request is a form officers send Verizon to bypass the warrant requirement in gaining subscriber data if exigent circumstances exist. Officers request the form from Verizon by informing Verizon of the attendant facts, and Verizon determines if the circumstances qualify for an emergency disclosure form. In requesting Stewart's phone data, officers stated, "A murder occurred in Myrtle Beach and information from the victim's phone indicates he was supposed to meet the [unidentified number's subscriber.] At this time we don't know if [there is] another victim, in need of assistance, or if they are the perpetrator."

[2] This data provided officers with Stewart's name and address; incoming and outgoing phone calls and texts, including dates, times, durations, numbers called or

filed a proper search warrant with Verizon, and the warrant was returned with the same information roughly a week after officers found Victim's body.

Using Stewart's CSLI data from the emergency disclosure form, officers determined that between 12:54 A.M. and 1:26 A.M. on the night of the murder, both Stewart and Victim were using the same service tower. A member of Charleston's cellular analysis survey team (CAST)[3] testified that both Stewart's and Victim's phones were within the same sector[4] of the tower between 1:16 A.M. and 1:17 A.M. He also stated both phones obtained service from a service area overlapping at the crime scene and that the overlapping service area was between seven-tenths and 1.21 miles wide.

Utilizing Stewart's subscriber information from the emergency disclosure form, officers learned his address in Chester County. Two days after discovering Victim's body, officers contacted Chester County police for assistance in locating Stewart and executing a search warrant on his home. After finding Stewart in Chester, Detective Will Kitelinger and a resource officer from Stewart's high school interrogated Stewart about his whereabouts on the night of Victim's murder.[5] Kitelinger read Stewart his *Miranda* rights, and Stewart signed a *Miranda* waiver form claiming he understood his rights. Thereafter, Stewart gave a videotaped confession detailing his participation in the murder. Stewart was with police in Chester for roughly two hours, and according to Kitelinger's written report, "after being confronted with the evidence, especially the text messages, [Stewart] admitted to being in the victim's car and eventually shooting him."[6] Kitelinger also presented evidence to Stewart showing officers could place him in Myrtle Beach on the night of the murder.

The Horry County Grand Jury indicted Stewart for murder, possession of a deadly weapon during the commission of a violent crime, and attempted armed robbery,

---

texted, cell towers connected to for each call or text, and verbiage of text conversations; voice logs; and CSLI data.

[3] CAST is a branch of the F.B.I. tasked with determining approximate locations of cell phones at a particular date and time based on CSLI data.

[4] A typical cell tower has a three-sided antenna with each side covering a 120-degree "pie-width shape," called a sector.

[5] Stewart was eighteen years old at the time of the murder and was enrolled as a student at Chester High School.

[6] Neither Stewart's recorded confession nor Kitelinger's report were included within the record on appeal.

and the case proceeded to trial in October 2018.  Prior to opening statements, the trial court heard arguments on Stewart's motions to suppress his confession and the phone data procured by the emergency disclosure form.  Stewart objected to the State publishing his confession on the basis of the Sixth Amendment Confrontation Clause.  Specifically, Stewart contended Kitelinger's interrogation amounted to testimony under *Crawford v. Washington*,[7] requiring suppression of the confession because Stewart did not have an opportunity to cross-examine Kitelinger before trial and he was unavailable to testify at trial.  Further, Stewart argued the warrantless search of his data via the emergency disclosure form and the use of the data in his interrogation violated the Fourth Amendment.

The trial court denied both of Stewart's motions to suppress and ruled the videotaped confession was admissible regardless of Stewart's inability to cross-examine Kitelinger, stating *Crawford* was designed to protect a defendant against witnesses bearing testimony against him or her, not an officer's statements and questions during an interrogation.  The court further ruled both the call and text logs were admissible under exigent circumstances, reasoning, "The protection of a[ potential] innocent third party engaged in communication with the decedent is a legitimate concern[,] . . . the only exigent circumstance which can be made to exist in this case."  The trial court ruled, however, that exigent circumstances did not support the warrantless search of Stewart's CSLI data, which was not relevant to the protection of a third party, and it suppressed the CSLI data to the extent it was used in the interrogation or to link Stewart to the crime.  The court ordered that any mention of the CSLI in Stewart's interrogation be redacted, but it ruled the same information found pursuant to the valid search warrant was admissible.

The jury found Stewart guilty as indicted, and the trial court sentenced him to an aggregate term of fifty-five years' imprisonment with credit for time served.  This appeal followed.

## ISSUES ON APPEAL

I.  Did the trial court err in denying Stewart's motion to suppress the CSLI data found during the warrantless search of his cell phone?

II.  Did the trial court violate Stewart's Sixth Amendment right to confront adverse witnesses by admitting his recorded confession even though Kitelinger was

---

[7] 541 U.S. 36 (2004).

unavailable to testify and Stewart had no prior opportunity to cross-examine Kitelinger?

## STANDARD OF REVIEW

In appeals involving a motion to suppress based on Fourth Amendment grounds, appellate courts apply a deferential standard of review and will reverse only in cases of clear error. *State v. Cardwell*, 425 S.C. 595, 599, 824 S.E.2d 451, 453 (2019). Under the "clear error" standard, an appellate court may not reverse a trial court's findings of fact merely because it would have decided the case differently. *State v. Moore*, 415 S.C. 245, 251, 781 S.E.2d 897, 900 (2016). In reviewing Fourth Amendment cases, appellate courts must affirm a trial court's ruling if there is any evidence to support it. *Robinson v. State*, 407 S.C. 169, 180–81, 754 S.E.2d 862, 868 (2014).

## LAW/ANALYSIS

### I.    Warrantless Search of Stewart's CSLI Data

Stewart argues officers violated his Fourth Amendment right against unreasonable searches and his right to privacy guaranteed under Article I, Section 10 of the South Carolina Constitution by collecting his CSLI data without a warrant. Specifically, Stewart asserts that the trial court erred in admitting the CSLI evidence and his recorded confession as they were fruits of the illegal search. We disagree.[8]

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. In this case, during the suppression hearing, the trial court ruled in Stewart's favor regarding the CSLI data and ordered that any mention of it in the recorded confession be redacted and that no "fruit"

---

[8] At trial and in his appellant's brief, Stewart argued the trial court erred in admitting evidence of his subscriber information and call and text logs under the exigent circumstances doctrine. However, at oral argument, Stewart conceded he did not hold a reasonable expectation of privacy in his subscriber information or the call and text logs; therefore, we decline to address these issues. *See Bowaters Carolina, Corp. v. Carolina Pipeline Co.*, 259 S.C. 500, 505, 193 S.E.2d 129, 132 (1972) (per curiam) (stating appellate courts need not address issues conceded at oral argument).

from the warrantless search was admissible at trial. *See Hutto v. State*, 376 S.C. 77, 81, 654 S.E.2d 846, 848 (2007) ("The 'fruit of the poisonous tree' doctrine provides that evidence must be excluded if it would not have come to light but for the illegal actions of the police, and the evidence has been obtained by the exploitation of that illegality." (quoting *State v. Copeland,* 321 S.C. 318, 323, 468 S.E.2d 620, 624 (1996))).

Stewart, in essence, won his motion to suppress all the evidence produced by the warrantless search of his CSLI data; on appeal, though, he argues the police exploited the ill-gotten CSLI data during his interrogation to produce the confession, making the entire confession fruit of the warrantless search. However, Stewart failed to include within the record on appeal his recorded confession or the redacted version published to the jury at trial, and therefore, he failed to provide an adequate record for this court's review. *State v. Tyndall*, 336 S.C. 8, 17, 518 S.E.2d 278, 283 (Ct. App. 1999) ("An appellant has a duty to provide this court with a record sufficient for review of the issues on appeal."); *State v. Motley*, 251 S.C. 568, 164 S.E.2d 569, (1968) ("The general rule is that the admission of evidence is largely within the discretion of the trial judge and in order to constitute reversible error in the admission thereof, the accused must be prejudiced thereby; and the burden is upon him to satisfy this court that there was prejudicial error.").

Moreover, we find the trial court did not err in refusing to suppress the CSLI data under the South Carolina Constitution's express grant of privacy rights because the officers would have inevitably discovered the CSLI data under a valid search warrant. Article 1, Section 10 states, "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures and unreasonable invasions of privacy shall not be violated . . . ." "[T]he inevitable discovery doctrine provides that illegally obtained information may nevertheless be admissible if the prosecution can establish by a preponderance of the evidence that the information would have ultimately been discovered by lawful means." *State v. Moore*, 429 S.C. 465, 839 S.E.2d 882, (2020) (alteration in original) (quoting *State v. Cardwell*, 425 S.C. 595, 601, 824 S.E.2d 451, 454 (2019)). Here, only hours after the murder, officers utilized two valid warrants to search Victim's car and cell phones. A search of one phone disclosed all of Victim's recent phone calls and text messages with an unidentified phone number. Using a database, officers determined the unidentified number's service provider and contacted the provider to request the name of the individual associated with the phone number. The service provider named Stewart as the subscriber. Officers also legally obtained Stewart's address under the emergency disclosure form and had all of the text content between Victim and Stewart on the night of the murder. Finally, officers

filed a proper search warrant with Verizon at roughly the same time they filed the emergency disclosure form, and Verizon provided the records a week after the murder, disclosing the same information and data as the emergency form. Because the officers legally obtained Stewart's name and address, and his CSLI data was legally obtained a week after the murder under a valid search warrant, we find the trial court did not err by refusing to suppress the CSLI data under Article 1, Section 10. *See id.* ("[I]llegally obtained information may nevertheless be admissible if the prosecution can establish by a preponderance of the evidence that the information would have ultimately been discovered by lawful means.").

Accordingly, we affirm on these issues.

## II.    Confrontation Clause

Stewart argues the trial court violated the Sixth Amendment Confrontation Clause by admitting his recorded confession because Kitelinger was unavailable to testify at trial. He contends Kitelinger's questions and remarks during the interrogation were testimonial, invoking his right to confront Kitelinger on cross-examination.[9]

The Confrontation Clause of the Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The right of a defendant to confront witnesses against him is not only applicable to state prosecutions under the Fourteenth Amendment, it is mandated by our state constitution. S.C. Const. art. I, § 14 ("Any person charged with an offense shall enjoy the right . . . to be confronted with the witness against him . . . .").

Out-of-court testimonial statements made by witnesses are inadmissible under the Confrontation Clause unless the witness is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine the witness. *See Crawford*, 541 U.S. at 68. The term "witness," as used in the Confrontation Clause, means those who "bear testimony" against the accused, and "[t]estimony . . . is . . . '[a] solemn declaration or affirmation made for the purpose of establishing or proving

---

[9] Stewart also argues on appeal that Kitelinger's remarks were hearsay and therefore inadmissible at trial. However, he did not renew this objection at trial after raising this argument during the pre-trial hearing; thus, this argument is unpreserved for appellate review. *See State v. Turner*, 373 S.C. 121, 126 n.1, 644 S.E.2d 693, 696 n.1 (2007) (finding an issue is not preserved for appellate review when no objection is made at trial).

some fact.'" *Id.* at 51 (second alteration in original) (quoting 2 N. Webster, *An American Dictionary of the English Language* (1828)). Custodial examinations, confessions, and statements taken by police officers in the course of interrogation are all considered testimonial in nature. *Id.* at 51–52; *see also State v. Ladner*, 373 S.C. 103, 112, 644 S.E.2d 684, 688–89 (2007). The Confrontation Clause is directed at barring the *product* of police interrogation. *See Michigan v. Bryant*, 562 U.S. 344, 354 (2011). It has "no application outside the scope of testimonial hearsay." *Ladner*, 373 S.C. at 113, 644 S.E.2d at 689 (quoting Tom Lininger, *Reconceptualizing Confrontation After Davis*, 85 Tex. L. Rev. 271, 285 (2006)).

Here, we find Kitelinger's absence at trial and the admission of Stewart's recorded confession did not violate the Confrontation Clause. First, Kitelinger was not a witness "bearing testimony" against Stewart as defined in *Crawford*. Although Kitelinger was adversarial to Stewart in the sense that he was part of a legal system seeking to incarcerate him, Kitelinger was not making statements against Stewart as the subject of an interrogation; Kitelinger was conducting the interrogation. Second, an interrogating officer's questions or statements made during an interrogation cannot be testimonial as defined in *Crawford* because the nature of interrogation is inquisitive, not declaratory. *See Crawford*, 541 U.S. at 51 ("'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." (alteration in original) (quoting Webster, *supra*)). Finally, the Confrontation Clause functions to bar the *product* of police interrogation that asserts incriminating facts against a defendant. The product of Kitelinger's interrogation—Stewart's responses to Kitelinger's questions—is testimonial, not Kitelinger's questions or statements. *See Bryant*, 562 U.S. at 354 ("The product of [interrogations solely directed at establishing the facts of a past crime], whether reduced to a writing signed by the declarant or embedded in the memory . . . of the interrogating officer, is testimonial." (quoting *Davis v. Washington*, 547 U.S. 813, 826 (2006))). Because Kitelinger's questions and statements made while interrogating Stewart were not testimonial, Stewart's recorded confession was not barred by the Sixth Amendment. *See Crawford*, 541 U.S. at 68 (finding nontestimonial statements are not barred at trial under the Confrontation Clause). Thus, we affirm on this issue.

**CONCLUSION**

Accordingly, Stewart's convictions and sentences are

**AFFIRMED.**

**THOMAS and HILL, JJ., concur.**